# IN THE SUPREME COURT OF CALIFORNIA

CORBY KUCIEMBA et al.,
Plaintiffs and Appellants,

v.

VICTORY WOODWORKS, INC.,
Defendant and Respondent.

S274191

Ninth Circuit
21-15963

Northern District of California
3:20-cv-09355-MMC

July 6, 2023

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

KUCIEMBA v. VICTORY WOODWORKS, INC.

S274191

Opinion of the Court by Corrigan, J.

Here we answer two questions of California law certified from the United States Court of Appeals for the Ninth Circuit concerning the scope of an employer's liability when an employee's spouse is injured by transmission of the virus[1] that causes the disease known as COVID-19. The questions are: (1) If an employee contracts COVID-19 at the workplace and brings the virus home to a spouse, does the California Workers' Compensation Act (WCA; Lab. Code, § 3200 et seq.) bar the spouse's negligence claim against the employer? (2) Does an employer owe a duty of care under California law to prevent the spread of COVID-19 to employees' household members?[2]

The answer to the first question is no. Exclusivity provisions of the WCA do not bar a nonemployee's recovery for injuries that are not legally dependent upon an injury suffered by the employee. The answer to the second question, however, is also no. Although it is foreseeable that an employer's

---

[1]    The virus in question is formally designated as SARS-CoV-2.

[2]    When the district court rendered its decision in the underlying case, the first question was one of first impression. Subsequently, the Second District Court of Appeal squarely addressed the question in *See's Candies, Inc. v. Superior Court* (2021) 73 Cal.App.5th 66, review denied Apr, 13, 2022, S272923 (*See's Candies*). The Court of Appeal did not have occasion to answer the second question.

1

negligence in permitting workplace spread of COVID-19 will cause members of employees' households to contract the disease, recognizing a duty of care to nonemployees in this context would impose an intolerable burden on employers and society in contravention of public policy. These and other policy considerations lead us to conclude that employers do not owe a tort-based duty to nonemployees to prevent the spread of COVID-19.

## I. BACKGROUND

Because this matter is presently on appeal from a dismissal under Federal Rules of Civil Procedure, rule 12(b)(6) (28 U.S.C.), we recite the facts as alleged in the operative complaint. (See *Papasan v. Allain* (1986) 478 U.S. 265, 286.) The question at this stage of the litigation is the legal sufficiency of the pleadings. We treat the factual allegations as true for purposes of addressing the certified questions. (See *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 555–556.)

COVID-19 is a highly contagious and potentially fatal respiratory illness spread through airborne droplets, like those produced from coughs or sneezes. The complaint alleges the disease can also be spread by contact with virus particles left on the surface of objects. The disease was recognized in early 2020 and spread rapidly across the globe. In March 2020, the World Health Organization declared COVID-19 a pandemic, and Bay Area counties issued shelter-in-place orders prohibiting nonessential travel. Eventually, these orders were relaxed and replaced with orders tailored to specific industries. As relevant here, the City and County of San Francisco's health officer issued an order on April 29, 2020 prescribing health and safety

guidelines to prevent the spread of COVID-19 at construction jobsites.

On May 6, 2020, Robert Kuciemba began working for defendant Victory Woodworks, Inc. (Victory) at a construction site in San Francisco. About two months later, without taking precautions required by the county's health order, Victory transferred a group of workers to the San Francisco site from another location where they may have been exposed to the virus. After being required to work in close contact with these new workers, Robert became infected.[3] He carried the virus home and transmitted it to his wife, Corby, either directly or through her contact with his clothing and personal effects. Corby was hospitalized for several weeks and, at one point, was kept alive on a respirator.[4]

On October 23, 2020, the Kuciembas sued Victory in superior court. Corby asserted claims for negligence, negligence per se, premises liability, and public nuisance. Robert asserted a claim for loss of consortium. Victory removed the case to federal court and moved to dismiss. The district court granted the motion with leave to amend. Plaintiffs filed an amended complaint reasserting the same causes of action except the public nuisance claim. The district court granted a renewed motion to dismiss, this time without leave to amend, concluding: (1) claims that Corby contracted COVID-19 through direct

---

[3]    Because they share a last name, we refer to plaintiffs by their first names to avoid confusion.

[4]    According to the original complaint, Robert was also hospitalized for his COVID-19 infection. Robert filed a workers' compensation claim for this injury, however, and does not allege a direct negligence claim.

contact with Robert were barred by the WCA's exclusive remedy provisions; (2) claims that Corby contracted COVID-19 through indirect contact with infected surfaces were subject to dismissal for failure to plead a plausible claim; and (3) to the extent the claims were not barred by statute or insufficiently pleaded, they failed because Victory's duty to provide a safe workplace did not extend to nonemployees, like Corby, who contract a virus away from the jobsite.

Plaintiffs appealed, and on June 22, 2022, we agreed to answer the certified questions.

## II. DISCUSSION

### A. *Workers' Compensation Exclusivity*

The California's workers' compensation system is a comprehensive statutory scheme through which employees may receive prompt compensation for costs related to injuries incurred in the course and scope of their employment. (Lab. Code, § 3200 et seq.; see *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810 (*Vacanti*).) The system is premised on a theoretical exchange we have called the " 'compensation bargain.' " (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16.) Under this bargain, "the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." (*Ibid*.)

To effectuate this exchange, the WCA limits an employee's remedies for covered injuries. When the statutory conditions for recovery are met, an employer's liability to pay compensation

under the WCA is "in lieu of any other liability whatsoever to any person." (Lab. Code, § 3600, subd. (a).) Similarly, with limited exceptions not relevant here, "the right to recover compensation is . . . the sole and exclusive remedy of the employee or his or her dependents against the employer." (Lab. Code, § 3602, subd. (a).) A basic prerequisite to the payment of compensation, and triggering of these exclusivity provisions, "is that the compensation sought is for an injury to an employee. In some circumstances, however, the bar on civil actions based on injuries to employees extends beyond actions brought by the employees themselves." (*Snyder v. Michael's Stores, Inc.* (1997) 16 Cal.4th 991, 996 (*Snyder*).) As noted, the relevant statutes provide that an employer's compensation obligation is "in lieu of any other liability whatsoever *to any person*" (Lab. Code, § 3600, subd. (a), italics added), and such compensation is "the sole and exclusive remedy of the employee *or his or her dependents* against the employer" (Lab. Code, § 3602, subd. (a), italics added). "This statutory language conveys the legislative intent that 'the work-connected injury engender[] a single remedy against the employer, exclusively cognizable by the compensation agency.' " (*Snyder*, at p. 997.)

Because the workers' compensation system has its theoretical basis in the compensation bargain between employer and employee, a nuanced analysis is required when third parties seek to sue the employer after an employee's work-related injury. In general, workers' compensation benefits provide the exclusive remedy for third party claims if the asserted claims are "collateral to or derivative of" the employee's workplace injury. (*Snyder, supra,* 16 Cal.4th at p. 997; see *King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1051 (*King*); *Vacanti, supra,* 24 Cal.4th at p. 811.) This aspect of workers'

compensation law is sometimes called the derivative injury doctrine. (See, e.g., *Snyder*, at p. 1000.) Examples of third party claims deemed "collateral" or "derivative" include heirs' claims for an employee's wrongful death (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 286), a spouse's claim for loss of consortium (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 284–285 (*LeFiell*)), and a spouse's claim for negligent infliction of emotional distress caused by witnessing an employee's injuries (*Williams v. Schwartz* (1976) 61 Cal.App.3d 628, 634). In general, a family member's claim for an injury derived from an employee's workplace injury is barred by workers' compensation exclusivity. However, a family member's claim for her *own* independent injury, not legally dependent on the employee's injury, is not barred, even if both injuries were caused by the same negligent conduct of the employer. (*Snyder*, at p. 998.)

Determining the scope of workers' compensation exclusivity can be analytically challenging. (See *Vacanti*, *supra*, 24 Cal.4th at p. 811.) After all, a spouse's complaint for loss of consortium or negligent infliction of emotional distress seeks damages for injuries that the nonemployee plaintiff personally suffers. Yet, the spouse's claims would not arise but for the fact that the employee was injured. It is the fact of the employee's workplace injury that results in the spouse's loss of consortium or emotional distress. If the employee had not been injured, the spouse's injury would not have occurred. However, we have held that something more than factual, or "but for," causation is necessary to give rise to the exclusivity bar imposed by the derivative injury doctrine. A plaintiff's claim is barred as derivative only if the plaintiff is required to prove injury to the

employee as at least part of a *legal* element of the plaintiff's own cause of action.

For example, a common law loss of consortium claim requires proof of "four elements: '(1) a valid and lawful marriage between the plaintiff and the person injured at the time of the injury; [¶] (2) a tortious injury to the plaintiff's spouse; [¶] (3) loss of consortium suffered by the plaintiff; and [¶] (4) the loss was proximately caused by the defendant's act.'" (*LeFiell, supra,* 55 Cal.4th at pp. 284–285.) Because the plaintiff is required to prove that her spouse suffered tortious injury, the claim is " 'by its nature, dependent on the existence of a cause of action for tortious injury to a spouse.' " (*Id.* at p. 285.) A wife may suffer her own loss of consortium injury, but that claim legally derives from the tortious injury to her husband. Similarly, a bystander's recovery for negligent infliction of emotional distress is permitted only if the "plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress." (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 667–668, fns. omitted.) As with loss of consortium, to be legally sufficient the emotional distress claim requires the occurrence of a separate injury to the plaintiff's close relation.

We explored this requirement of legal dependence in *Snyder, supra,* 16 Cal.4th 991. There, the plaintiff alleged she was injured in utero when her mother inhaled toxic fumes in the workplace. (*Id.* at p. 994.) The mother was hospitalized with symptoms from the exposure, and the plaintiff suffered permanent neurological damage. The trial court had sustained a demurrer to the child's negligence action based on *Bell v.*

*Macy's California* (1989) 212 Cal.App.3d 1442 (*Bell*), which held that fetal injuries are derivative of injuries to the pregnant mother as a matter of law. (*Snyder*, at p. 994.) *Snyder* rejected this approach and concluded the child's claim was not barred as derivative because the plaintiff's action sought compensation for her own injuries, not her mother's. (*Id.* at p. 995.) The mother's inhalation of fumes was a "but for" fact in the causal chain of injury, but it was not legally required to be proven as an element of the daughter's own cause of action.

*Snyder*'s analysis began with a close examination of the *Bell* case, which it then disapproved. The pregnant employee in *Bell* had complained of severe abdominal pain, which turned out to be caused by a ruptured uterus. An on-site nurse employed by Macy's misdiagnosed the condition and delayed calling for an ambulance. The complaint alleged that the delay caused fetal brain damage. (*Bell, supra*, 212 Cal.App.3d at pp. 1446–1447.) The trial court granted summary judgment to Macy's on the ground that the child's claims were barred by the derivative injury doctrine. The *Bell* court affirmed, concluding workers' compensation exclusivity barred the child's tort claims against the employer because a fetus in utero is inseparable from its mother. Therefore, the prenatal injuries were "a collateral consequence" and a "direct result" of the employer's negligence toward the mother. (*Id.* at p. 1453.) *Bell* reasoned that injury to a fetus "can only occur as the result of some condition affecting its mother," and if that condition arises in the course of employment the derivative injury doctrine applies. (*Id.* at p. 1453, fn. 6.)

*Snyder* rejected *Bell*'s focus on the relationship of fetal injuries to a maternal "condition" as overbroad: "Neither the statutes nor the decisions enunciating the [derivative injury]

rule suggest workers' compensation exclusivity extends to all third party claims deriving from some 'condition affecting' the employee. Nor is a nonemployee's injury collateral to or derivative of an employee injury merely because they both resulted from the same negligent conduct by the employer. The employer's civil immunity is not for all liability resulting from negligence toward employees, but only for all liability, to any person, deriving from an employee's work-related *injuries*. ([Lab. Code,] § 3600.)" (*Snyder*, *supra*, 16 Cal.4th at p. 998.) In *Bell*, the suit rested on the direct injury to the child caused by the employer's delay in summoning aid. It neither alleged, nor was required to allege as an element of proof, any workplace injury to the mother herself.

Our opinion in *Snyder* then mentioned two aspects of the analysis for determining whether a third party's injury is derivative. First, we quoted *Bell*'s dissenting justice, who opined that the derivative injury rule applies when the third party claim is " 'derivative . . . in the purest sense' " in that " '[i]t simply would not have existed in the absence of injury to the employee.' (*Bell*, *supra*, 212 Cal.App.3d at p. 1456 (conc. and dis. opn. of White, P. J.).)" (*Snyder*, *supra*, 16 Cal.4th at p. 998.) Second, we related an advocate's view that the derivative injury rule "applies when the plaintiff, in order to state a cause of action, *must* allege injury to another person — the employee." (*Ibid*.) From this discussion, Victory and its supporting amici curiae derive a rule for derivative injuries that is based on *factual* causation. They assert that if a third party's injury would not have occurred *but for* an injury to the employee, it is derivative of the employee's injury for workers' compensation purposes. Here, because Corby would not have become ill with COVID-19 but for her husband Robert's infection at work, they

argue Corby's injury is derivative of Robert's and her claims are therefore barred by workers' compensation exclusivity.

The argument misinterprets *Snyder*. We explained there that the derivative injury rule governs when " 'the third party *cause of action* [is] derivative of the employee injury.' " (*Snyder*, *supra*, 16 Cal.4th at p. 998, italics added.) *Snyder* thus tethered the derivative injury analysis to the plaintiff's *cause of action*, not to a factual relationship between injuries to the plaintiff and the employee. That focus is confirmed by *Snyder*'s next sentence, which explains that the derivative injury rule comes into play when the plaintiff must allege injury to an employee "*in order to state a cause of action.*" (*Ibid.*, italics added.) *Snyder* did not hold that the exclusivity bar arises any time an employee injury is a "but for" cause of injury to a third party. Read carefully, the case holds that exclusivity provisions bar a third party claim only when proof of an employee's injury is required as an element of the cause of action.

*Snyder* took pains to note that a third party's claim must be *legally dependent* on an employee's injury for the derivative injury rule to apply. For example, we observed that the *Bell* court erred in examining whether the fetal injuries resulted from negligent treatment of the mother or a "condition" affecting the mother. (*Snyder*, *supra*, 16 Cal.4th at p. 999.) Instead, we explained, the court should have asked "whether [the child's] claim was *legally dependent* on [the mother's] work-related *injuries*." (*Ibid.*, first italics added.) We faulted *Bell*'s assertion that fetus and mother were " 'inseparable,' " noting that fetal and maternal injuries are not necessarily related. (*Id.* at p. 1000.) Then, of critical importance here, we held that "[e]ven when the mother *is* injured, . . . the derivative injury rule does not apply unless the child's claim can be considered merely

collateral to the mother's work-related injury, *a conclusion that rests on the legal or logical basis of the claim rather than on the biological cause* of the fetal injury." (*Ibid.*, second italics added.)

Accordingly, Victory's sole focus on viral transmission as a factual "but for" cause is misplaced. For the derivative injury rule to apply, Robert's infection must not only be the factual cause of Corby's illness; Corby's claim must also be "*legally dependent* on injuries suffered by" Robert. (*Snyder, supra,* 16 Cal.4th at p. 1000, italics added.) Robert's infection may have been a necessary *factual* step in the causal chain that led to Corby's illness. But it is not necessary for Corby to allege or prove injury to Robert to support her own negligence claim. The difference becomes clear when her claim is compared to a derivative claim like loss of consortium. If Corby had sought recovery for loss of consortium, she would have been required to prove that an injury to her spouse, Robert, in turn injured her by affecting their marital relationship. (See *LeFiell, supra,* 55 Cal.4th at p. 285.) To support her negligence claim here against Victory, however, she need only show that Robert was exposed to the virus at the workplace and carried it home to her. As plaintiffs point out, it does not matter for purposes of Corby's claim whether Robert himself developed COVID-19 or suffered any cognizable injury from his exposure to the virus. Corby's negligence claim is not legally dependent on any actual injury to Robert.

The recent decision in *See's Candies, supra,* 73 Cal.App.5th 66 properly applied *Snyder* in addressing essentially the same facts presented here. The *See's Candies* complaint alleged that a wife had contracted COVID-19 at work due to the company's poor safety practices. She infected her husband, who died from the illness. (*Id.* at p. 72.) The trial

court rejected the company's argument that the wife's wrongful death claims were barred by workers' compensation exclusivity because the husband's death would not have occurred but for her own workplace injury. (*Id.* at pp. 72–73.) Ruling on the company's petition for writ relief, the Court of Appeal affirmed, concluding the company's sole reliance on biological causation was inconsistent with our discussion in *Snyder*. The court observed that *Snyder* repeatedly described "collateral or derivative claims as those that are 'legally' or 'logically' dependent on an employee's injuries." (*Id.* at p. 85, quoting *Snyder*, *supra*, 16 Cal.4th at pp. 999, 1000, 1005.) After discussing some unifying features of derivative claims, the court correctly concluded the derivative injury rule applies when it is "legally impossible to state a cause of action . . . without alleging a disabling or lethal injury to another person." (*See's Candies*, at p. 86.) Moreover, the court noted, "a construction of the derivative injury rule premised solely on causation would bar civil claims by *any* person injured as a result of the employee's injury," not just claims from family members. (*Id.* at p. 89.)

The *See's Candies* decision made a further observation about derivative injury claims that is relevant here: These claims generally seek recovery for economic or intangible losses sustained as a result of a loved one's disability or death, rather than for the plaintiff's own *physical* injuries or death. (*See's Candies*, *supra*, 73 Cal.App.5th at p. 88; see *Snyder*, *supra*, 16 Cal.4th at pp. 1001–1002.) Unless a plaintiff's physical injury or death claim were somehow legally dependent upon an employee's workplace injury, it would not be barred as derivative. (See *Snyder*, at p. 1000.) Indeed, it appears only one appellate decision has applied the derivative injury rule to a third party's separate physical injuries.

*Salin v. Pacific Gas & Electric Co.* (1982) 136 Cal.App.3d 185 (*Salin*) involved unusual facts. Salin's highly stressful job allegedly caused him to become increasingly mentally deranged. (*Id.* at pp. 187–188.) One day, as a result of the extreme pressure exerted by his employer, Salin attempted to kill himself but instead shot and killed his two young daughters. (*Id.* at p. 189.) He then sued his employer for his daughters' wrongful deaths. (*Ibid.*) The Court of Appeal was skeptical of this claim. It correctly concluded workers' compensation provided the sole remedy for Salin's own injuries because, as the complaint alleged, the psychotic episode was proximately caused by his own employment. (*Id.* at pp. 190–191; see Lab. Code, §§ 3600, subd. (a), 3602, subd. (a).) However, the court went astray when it held workers' compensation exclusivity also barred a claim for the daughters' wrongful death. Accepting that Salin stood in the shoes of his nonemployee daughters in asserting the claim, the court reasoned that any claim by the daughters against the employer would have been barred because the daughters' injuries, like Salin's own, were factually caused by an employment-related mental condition. (*Salin*, at pp. 191–193.)

*Salin*'s analysis on this point was thin. Quoted in full, it reads: "We have considered plaintiff's argument, as we understand it, that in respect of his daughters' wrongful death, he stands in the position of a nonemployee third party who has suffered injury and damages as a result of the tortious act of an employer. [¶] The point is answered by Labor Code section 3600 stating that: 'Liability for compensation [by an employer to a worker is] in lieu of any other liability whatsoever *to any person.* . . .'" (Italics added.) [¶] Moreover, we observe judicial holdings that where, following a work-related injury or death,

conditions of compensation exist, third parties who have suffered prejudice or damages by virtue of such injury or death[] are barred from recovery in actions at law against the employer. [¶] California, as do most, if not all of the states of the union, follows the ' "broader view of the exclusion of liability on the part of the employer *to any person whatsoever* by reason of the injury accruing to the employee whether such person be a dependent or nondependent." ' [Citations.] Recognizing this rule, plaintiff concedes, as he must, that: 'A series of cases apply the exclusive remedy rule where the alleged injury stems directly from the employee's injury.' " (*Salin*, *supra*, 136 Cal.App.3d at pp. 191–192.) Citing loss of consortium, emotional distress and wrongful death claims, *Salin* concluded: "It follows that had plaintiff's daughters survived the injuries he had inflicted upon them, or had otherwise been damaged due to his employment-related mental condition, *they* would have had no cause of action against [the employer]." (*Id.* at p. 192.)

As is apparent from the foregoing, the *Salin* court relied solely on the statutory provision limiting employers' liability for injuries "sustained by . . . *employees*" (Lab. Code, § 3600, subd. (a), italics added) and on derivative injury cases involving intangible or economic losses. At no point did the court explain what authorities or rationale supported extending the derivative injury rule to encompass independent third party claims for personal injury or death resulting from the employer's negligent conduct. It simply assumed that a "but for" link to the employee's injury was sufficient to make a third party's claim derivative.

Our opinion in *Snyder* cast some doubt on this analysis. If this court had agreed that "but for" causation alone is sufficient to render a third party's personal injury claim derivative,

*Snyder* would have discussed *Salin* with approval. But it did not. Instead, after explaining that claims for wrongful death, loss of consortium, and negligent infliction of emotional distress are derivative because the alleged injuries are "legally as well as causally" dependent on an employee's injury (*Snyder*, *supra*, 16 Cal.4th at p. 999), *Snyder* mentioned *Salin* in a footnote, observing that "[o]ne Court of Appeal has gone farther" (*id*. at p. 999, fn. 2). Without deciding the correctness of *Salin*'s holding, we observed that Labor Code "sections 3600 through 3602 do not directly support the *Salin* court's extension of the derivative injury rule to third party injuries allegedly caused by an injured employee's postinjury acts." (*Ibid*.) We now clarify that, without more, a mere causal link between a third party's personal injury and an employee's injury is not sufficient to bring the third party's claim within the scope of the derivative injury rule.[5] *Salin v. Pacific Gas & Electric Co.*, *supra*, 136

---

[5] Our holdings in *Vacanti*, *supra*, 24 Cal.4th 800 and *King*, *supra*, 5 Cal.5th 1039 are consistent with this analysis. In *Vacanti*, lien holders sought to recover compensation for medical services they provided to employees for workplace injuries (*Vacanti*, at p. 815), and, in *King*, an employee sought to recover for separate injuries that arose from the treatment of his workplace injury (*King*, at pp. 1052–1053). Although the opinions stated that "injuries arising out of and in the course of the workers' compensation claims process fall within the scope of the exclusive remedy provisions because this process is tethered to a compensable injury" (*Vacanti*, at p. 815; see *King*, at p. 1052), their holdings were not based on factual causation. Instead, they rely on the principle that the WCA provides only a single remedy for an employee's workplace injury. (See Lab. Code, § 3600; *Snyder*, *supra*, 16 Cal.4th at p. 996.) Because both cases involved attempts to recover additional amounts for an employee's compensable workplace injury, the claims in those

Cal.App.3d 185 is disapproved to the extent it conflicts with the views expressed herein.

Victory posits a number of grounds for distinguishing or limiting *Snyder*. Although we agree there are some significant factual differences between that case and this one, *Snyder*'s guidance on the derivative injury rule remains compelling.

As Victory points out, the unborn child in *Snyder* "did not 'catch' birth defects from the employee." Although the fetus was exposed to toxic fumes only because her mother inhaled them, she alleged she was injured by the fumes themselves and not as a result of an injury her mother suffered. (*Snyder, supra*, 16 Cal.4th at p. 1000.) According to Victory, this means the fetal injuries were entirely separate and independent from those of her employee-mother, just as if the fetus had instead been a child visiting the workplace in a stroller at the time of the carbon monoxide release. Victory contrasts these independent injuries with the situation here, in which Corby contracted COVID-19 only after breathing viral particles expelled by Robert or left on surfaces after he became a carrier of the disease.

It is not clear that the factual predicate for this distinction is accurate. One might also say that Corby was exposed to the virus *through* Robert, just as the fetus in *Snyder* was exposed to a toxin *through* her mother. In other words, the passage of a harmful substance through an intermediary does not necessarily render the resulting injury derivative of or collateral to an injury sustained by the intermediary. In any event, *Snyder* took pains to clarify that a causal "but for" link between

cases were barred by the WCA's exclusivity provisions. (See *King*, at pp. 1052–1053; *Vacanti*, at pp. 815–816.)

the injuries is not what matters for purposes of the derivative injury rule. The pertinent question is not whether an employee's work-related injury was a "but for" link leading to the third party injury. Instead, the pertinent question is whether the plaintiff's *claim* is logically or "legally dependent" on that employee injury. (*Snyder, supra,* 16 Cal.4th at p. 999, see *id.* at pp. 1000, 1005.) Because Corby's negligence claim does not require that she allege or prove that Robert suffered any injury, it is not barred by the derivative injury rule.[6]

Victory's additional attempts to cabin *Snyder* fare no better. First, Victory asserts *Snyder* intended to create nothing more than "an *in utero* rule" because all of the out-of-state cases the opinion discussed concerned fetal injuries. These authorities were most relevant to the facts in question, but that does not mean the legal principles *Snyder* announced do not apply in other contexts. We did not limit *Snyder*'s holding to in utero injuries. On the contrary, we observed that our discussion of *Bell* had "clarified the scope of the derivative injury doctrine." (*Snyder, supra,* 16 Cal.4th at p. 1000.) Second, Victory insists that the "key" to *Snyder*'s holding "was not the *manner* of the harm, but the *situs* of the harm — the fact that the fetus was independently injured on the employer's property." This

---

[6] An amicus curiae brief supporting Victory asserts that the derivative injury rule should bar recovery whenever an employee's injury is part of the causal chain leading to the nonemployee's injury, because "[c]ausation is an essential element of every negligence claim." (Amicus Curiae Brf. of United States Chamber of Commerce, et al., at p. 24.) The argument sweeps too broadly and would expand the derivative injury rule well beyond its currently recognized bounds. It also repackages the same focus on biological causation we rejected in *Snyder*.

assertion misreads our opinion. *Snyder*'s holding was not premised on the fact that the fetus was injured at the mother's workplace. The location where injury occurs is not a dispositive consideration for determining whether the derivative injury rule bars a nonemployee's recovery. *Snyder* did not suggest otherwise.

As we noted in *Snyder*, care must be taken when considering extensions of the derivative injury rule because the WCA's " 'compensation bargain' . . . is between businesses and their *employees* and generally does not include third party injuries." (*Snyder*, *supra*, 16 Cal.4th at p. 1004.) Although it makes sense to consider purely collateral or derivative losses as part of the employee's exchange, nothing in the language of the WCA nor the case law construing it "remotely suggests that third parties who, because of a business's negligence, suffer injuries — logically and legally independent of any employee's injuries — have conceded their common law rights of action as part of the societal 'compensation bargain.' " (*Id.* at p. 1005.) Instead, those losses are properly subject to compensation under a conventional tort analysis. (*Ibid.*; see Civ. Code, § 1714, subd. (a).)

Finally, although the issue is still novel, we note that one other court has also concluded derivative injury principles do not bar "take-home" COVID-19 claims. In *Estate of de Ruiz v. ConAgra Foods Packaged Foods, LLC* (E.D.Wis. 2022) 601 F.Supp.3d 368 (*Ruiz I*), a federal district court considered whether exclusivity provisions of the Wisconsin's Worker's Compensation Act barred recovery for the death of a spouse from COVID-19 following her husband's workplace infection with the virus. Construing statutes similar to Labor Code sections 3600 and 3602 (see *Ruiz I*, at p. 375), the court concluded claims for

the wife's death were not barred. It distinguished Wisconsin case law finding loss of consortium claims to be derivative injuries, noting that it made "sense to apply the exclusive-remedy provision in that situation because the nonemployee-spouse cannot legally state a cause of action without alleging a disabling or lethal injury to her spouse." (*Id*. at p. 376.) In the case before it, however, the wife was not merely a bystander but had "suffered an independent injury by contracting and dying of COVID-19." (*Ibid*.) The court stressed that claims for her death were "not legally dependent on" the husband's workplace injury, and the mere existence of a causal link between the injuries, through transmission of the virus, was not enough to trigger exclusivity provisions. (*Ibid*.)

The district court in *Ruiz I*, *supra*, 601 F.Supp.3d 368 also relied on *Woerth v. U. S.* (6th Cir. 1983) 714 F.2d 648, a decision under the Federal Employee's Compensation Act. In that case, a nurse contracted hepatitis while working at a veteran's administration hospital and passed the disease to her husband. The court concluded the husband's tort claims were not barred by workers' compensation exclusivity because he sought recovery not for losses ancillary to his wife's illness but for his own entirely independent medical expenses and lost wages. (*Woerth,* at pp. 649–650.) The court explained: "While [the husband's] hepatitis may derive from his wife as a matter of proximate cause, his cause of action does not. His right to recover for the negligence of the United States is based upon his own personal injury, not a right of 'husband and wife.'" (*Id*. at p. 650.) Of course, *Ruiz I* and *Woerth* are not binding precedent in California. Their logic, however, is persuasive.

Accordingly, we conclude exclusivity provisions of the WCA do not bar Corby's tort claims against Victory. Corby's

negligence claims are not legally or logically dependent on any workplace injury sustained by Robert, and the "but for" causal link between Corby's injury and Robert's exposure to COVID-19 is insufficient, on its own, to render the claims derivative. (See *Snyder*, *supra*, 16 Cal.4th at pp. 999–1000.)

B. *Duty of Care*

The second certified question asks whether California law imposes a duty of care on employers to prevent the spread of COVID-19 to their employees' household members. Before we address this substantive question, the parties' briefing requires us to clarify once again the appropriate framework for analyzing duty in this context.

1. *No Special Relationship Required*

Victory argues plaintiffs' assertion of duty here fails for lack of a special relationship. It contends no duty of care was owed because it was not in a special relationship with Corby, and its employer-employee relationship with Robert cannot be the basis of a duty to prevent harm away from the worksite or to third parties. The assertion that a special relationship is required misapprehends our case law and ignores the allegations in the operative complaint.[7]

---

[7] Amicus curiae See's Candies, Inc. and See's Candy Shops, Inc. (See's Candies) observes that courts in other states have declined to impose a duty of care to prevent COVID-19 transmission based on employers' lack of a special relationship with nonemployees. (See *Iniguez v. Aurora Packing Co., Inc.* (Ill.Cir.Ct. Mar. 31, 2021) 2021 WL 7185157 at p. *2 (*Iniguez*); *Estate of Madden v. Southwest Airlines, Co.* (D.Md. Jun. 23, 2021, Civ. A. No. 1:21-CV-00672-SAG) 2021 WL 2580119 at p. 4, fn. 1 (*Madden*).) The short answer to this argument is that the law in other states is different, and there is no indication in

Duty, under the common law, is essentially an expression of policy that " 'the plaintiff's interests are entitled to legal protection against the defendant's conduct.' " (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734; see *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 (*Bily*).) The requirement of a legal duty is frequently invoked " 'to limit generally "the otherwise potentially infinite liability which would follow from every negligent act." ' " (*Bily*, at p. 397; see *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*).)

The "general rule" of duty in California is established by statute. (*Cabral v. Ralph's Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) Civil Code section 1714, subdivision (a) states in relevant part: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." "This statute establishes the

---

these cases that either Illinois or Maryland has a statute equivalent to Civil Code section 1714 imposing a duty of care on all persons by default.

Similarly, Victory relies on *Elsheref v. Applied Materials, Inc.* (2014) 223 Cal.App.4th 451 to argue the employer-employee relationship "does not translate to a special relationship outside the workplace." In that case, a child born with birth defects sued his father's employer, claiming his injuries were caused by the father's exposure to workplace toxins. The court first concluded duty should not be imposed based on an analysis of policy factors (*id.* at pp. 460–461; see *post*, at pp. 29–46), then separately rejected the child's argument for duty based on lack of a special relationship (*Elsheref*, at pp. 461–462). Because we hold that a special relationship is not required given the nature of plaintiffs' allegations here, *Elsheref* is inapposite.

default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.' (*Cabral*, at p. 768.)" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 214 (*Brown*).)

As we recently explained, the rule of Civil Code section 1714, though broad, "has limits." (*Brown*, *supra*, 11 Cal.5th at p. 214.) It "imposes a general duty of care on a defendant only when it is the defendant who has ' "created a risk" ' of harm to the plaintiff, including when ' "the defendant is responsible for making the plaintiff's position worse." ' " (*Ibid.*, quoting *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 (*Lugtu*).) "The law does not impose the same duty on a defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged. Generally, the 'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Brown*, at p. 214, quoting *Williams v. State of California* (1983) 34 Cal.3d 18, 23; see *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*).)

The situations we confronted in *Brown* and *Regents* fell within this exception to Civil Code section 1714's default rule of duty. In both cases, the plaintiffs' injuries were inflicted by a third party, not the defendant. The *Brown* plaintiffs were sexually abused by their athletic coach (*Brown*, *supra*, 11 Cal.5th at p. 210), and the *Regents* plaintiff was stabbed by a fellow college student during class (*Regents*, *supra*, 4 Cal.5th at p. 617). The claims we considered in those cases were not against the individuals whose negligent or intentional conduct caused the plaintiffs harm, but against organizations the plaintiffs asserted were negligent in failing to *protect* them from the harm. (See *Brown*, at p. 210; *Regents*, at p. 617.) These

defendants, a sport's governing body and a university, did not create or contribute to the risk of sexual abuse or stabbing. For that reason, the default duty rule of Civil Code section 1714 did not apply, and the starting point for our analysis was instead the alternate rule that generally " 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203.)" (*Regents*, at p. 619; see *Brown*, at p. 214.) Under those circumstances, we explained, the law does not impose a duty to control, warn, or protect unless there is a special relationship between the parties that " 'gives rise to a duty to act.' " (*Regents*, at p. 619; see *Brown*, at p. 220.)

The complaint here alleges that, in violation of a City and County of San Francisco health order issued two months earlier, Victory transferred a group of previously off-site workers when there was reason to believe they had been exposed to the SARS-CoV-2 virus. According to the complaint, Robert's work placed him in close contact with these newly arrived workers. As a result, he was infected with the virus and passed it to his wife Corby. The complaint does not allege that Victory was negligent in failing to protect Corby from harm caused by the negligent or intentional misconduct of a third party. Rather, it alleges Corby was harmed by Victory's *own* misconduct in transferring potentially infected workers to Robert's jobsite and forcing Robert to work in close proximity to them.

It is true that Robert was the conduit for Corby's infection, and thus he was the immediate cause of her illness. But an exclusive focus on causation in this context is inconsistent with our case law. The proper question, we have explained, is instead whether the defendant's " 'entire conduct created a risk of harm' " to the plaintiff. (*Brown*, *supra*, 11 Cal.5th at p. 215,

fn. 6, quoting Rest.3d Torts, Liability for Physical and Emotional Harm (2012) § 37, com. c, p. 3; see *Brown*, at p. 214.) "Although we have held that the existence of a relationship between the plaintiff and the defendant is one basis for finding liability premised on the conduct of a third party [citations], we have never held that such a relationship is a prerequisite to finding that a defendant had a duty to prevent injuries due to *its own* conduct or possessory control." (*Kesner*, *supra*, 1 Cal.5th at p. 1163, italics added.) Likewise, *Brown* explained that "the no-duty-to-protect rule will not relieve the defendant of an otherwise applicable duty to exercise reasonable care when, by its own conduct, the defendant has increased the risk of harm to the plaintiff." (*Brown*, at p. 215, fn. 7.) Here, plaintiffs have alleged that *Victory* created a risk of harm by violating a county health order designed to limit the spread of COVID-19. These allegations raise a claim that Victory violated its obligation "to exercise due care in [its] own actions so as not to create an unreasonable risk of injury to others." (*Lugtu*, *supra*, 26 Cal.4th at p. 716; see Civ. Code, § 1714, subd. (a).) The fact that the alleged violation resulted in injury beyond the workplace, when the contagion was spread by an innocent third party, does not change the analysis.

*Kesner*, *supra*, 1 Cal.5th 1132 is consistent with this conclusion, because Civil Code section 1714 was the starting point of our duty analysis under analogous facts. There, plaintiffs contracted mesothelioma as a result of their family members' work with asbestos. They argued that defendant companies owed them a duty of care, as employers or landowners, to prevent "take-home" exposure to asbestos. (*Kesner*, at p. 1140.) The mechanism of injury was different in *Kesner*, because in that case the toxin itself was carried home on

the clothing or person of the workers, whereas here the virus generally passes to household members by indirect means, through a worker whose coughing or sneezing spreads airborne viral particles.[8] But in both cases the employee is a vector, bringing home a harmful substance that causes the plaintiff's injury. We began our analysis in *Kesner* with the default rule of Civil Code section 1714 and then considered whether policy considerations justified limiting or recognizing an exception to that duty. (See *Kesner*, at pp. 1142–1143.) Even though causation of the plaintiffs' injuries was indirect, as alleged here, our opinion never suggested that a special relationship was a required prerequisite for finding a duty of care.

Several additional arguments have been advanced for why the default duty of Civil Code section 1714 should not apply, but none is persuasive. Amicus curiae Construction Employers' Association (CEA) argues an employer cannot "create" a risk of COVID-19 because the virus is preexisting and does not derive from an employer's property or operations. Nor can an employer make a "plaintiff's position worse" (*Lugtu, supra*, 26 Cal.4th at p. 716) with respect to COVID-19, CEA asserts, because the virus is now ubiquitous. However, we have previously considered Civil Code section 1714 to be the source of a duty to prevent the negligent transmission of infectious disease. (See *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1188–1189 [HIV].) Moreover, CEA's arguments once again ignore the allegations of the complaint, which must be taken as true at this

---

[8] We do not address plaintiffs' theory of transmission from surfaces because the plausibility of those allegations remains the subject of dispute in the Ninth Circuit. We note, however, that the precise method of viral transmission makes no difference in our duty analysis.

stage in the litigation. (See *Papasan v. Allain, supra*, 478 U.S. at p. 286.) Victory need not have created the virus itself to owe a duty of care. What is important is that Victory allegedly created a *risk of infection* by transferring exposed workers to Robert's jobsite in violation of the county health order. By doing so, it also made Corby's situation worse by increasing the chances she would become infected with the virus through contact with her husband. Relatedly, CEA contends any increased risk was not "unreasonable" (see Civ. Code § 1714, subd. (a)) because the Governor's " 'Stay-Home Order' " permitted the continuation of essential work, including by construction contractors such as Victory. (See Governor's Exec. Order No. N-33-20 (Mar. 19, 2020).) To the extent this argument concerns duty as opposed to breach, plaintiffs do not assert Victory increased the risk of harm merely by continuing its business operations; they allege Victory engaged in affirmative misconduct by violating a county health order. These allegations are sufficient to support an assertion of duty under Civil Code section 1714.

CEA also argues cases applying Civil Code section 1714 "consistently involve defendants that created a risk through their own 'property or person' by introducing a dangerous product or activity into society." Unlike the asbestos that produced injury in *Kesner*, for example, Victory did not use the SARS-CoV-2 virus in its business or obtain any commercial benefit from it, although it presumably did benefit from the exemption that allowed it to continue operating during the pandemic. But this distinction from *Kesner* and similar cases does not exempt Victory from the default duty to use due care in its operations to avoid foreseeable injuries. Civil Code section 1714's duty is not premised on the defendant's use of

hazardous materials; indeed, several cases considering whether the duty applies have involved entirely different facts. (See, e.g., *Cabral, supra*, 51 Cal.4th at p. 768 [tractor-trailer parked alongside freeway]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 462–463 [garbage truck operating near bridle path].) Nor does case law support limiting an employer's duty of care to "business-specific activities." For example, *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 45–47, concluded a radio station owed a duty to a driver killed in a car accident by listeners who were participating in a radio-sponsored contest. And *Bigbee v. Pacific Telephone & Telegraph Co.* (1983) 34 Cal.3d 49, 55–58, held that a telephone company's duty of due care extended to a phone booth user who was struck by a drunk driver. We decline CEA's invitation to read new limitations into the statute.

Finally, amicus curiae See's Candies urges us to adopt the reasoning of a recent Court of Appeal decision declining to impose a duty on a public employer to prevent the spread of typhus. In *City of Los Angeles v. Superior Court* (2021) 62 Cal.App.5th 129, 132, the plaintiff alleged her husband contracted typhus from unsanitary conditions at the police station where he worked and passed the disease to her. Although the case is similar in that it involved transmission of a contagious disease to a spouse, it is different in significant respects. Because the defendant in *City of Los Angeles* was a public entity, its liability had to be based on statute rather than the common law. (*Id.* at p. 138; *Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 803.) To support her claim for a dangerous condition of public property under Government Code section 835, the plaintiff analogized the city's conduct to that of the negligent premises owners in *Kesner* who failed to

prevent the escape of asbestos from their properties. (*City of Los Angeles*, at pp. 141–142.) The Court of Appeal rejected this comparison, primarily because "*Kesner* involved private companies rather than public entities," and this court has held that public entity liability under Government Code section 835 is not coextensive with private liability. (*City of Los Angeles*, at p. 143; see *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1093 (*Vasilenko*).) For that reason, Civil Code section 1714 was inapplicable. (*City of Los Angeles*, at p. 143.) The court further observed that *Kesner* was distinguishable because the plaintiffs there were injured from contact with the hazardous workplace condition *itself*, carried home on the workers' clothing, whereas the plaintiff before it had contracted typhus from her husband months after he first became ill. (*Id.* at pp. 143–144.) The court therefore concluded the basis for premises liability in *Kesner*, "hazardous substances that have escaped the property and caused harm offsite," was not applicable to the facts alleged. (*Id.* at p. 144.) Because its holding was premised on the limited scope of liability under Government Code section 835, *City of Los Angeles* does not support a categorial rule against employer liability in other negligence contexts involving the transmission of infectious diseases.

As noted, we agree that the mechanism of harm to third parties is frequently different for a contagious disease than for those injured outside the workplace by a toxin like asbestos. *Kesner*'s holding might well be distinguished for this reason in addressing premises liability, a question we do not reach here. But the different mechanism of harm is not significant to the question that *is* before us: whether Civil Code section 1714 imposes a duty of care on employers to prevent the spread of

COVID-19 to employees and their household members. Nothing in *Kesner* suggested its reliance on the default rule of Civil Code section 1714 had anything to do with the specific mechanism of injury alleged. We conclude the default rule of duty applies in the COVID-19 context as well where plaintiffs have alleged that the defendant, through its own actions, created an unreasonable risk of the disease's transmission. That conclusion does not end the matter, however.

2. Rowland *Analysis*

Civil Code section 1714 articulates a general duty of care. But exceptions can be recognized when supported by compelling policy considerations. (See *Brown*, *supra*, 11 Cal.5th at p. 217; *Regents*, *supra*, 4 Cal.5th at p. 628; *Cabral*, *supra*, 51 Cal.4th at p. 771.) That is the case here.

*Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) identified several considerations that may, on balance, justify a departure from Civil Code section 1714's default rule of duty. (*Cabral*, *supra*, 51 Cal.4th at p. 771.) They are: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, at p. 113.) *Rowland*'s multifactor test "was not designed as a freestanding means of *establishing* duty, but instead as a means for deciding whether to limit a duty derived from other sources," like Civil Code section 1714.

(*Brown*, *supra*, 11 Cal.5th at p. 217, italics added.) "As we have also explained, however, in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.'" (*Cabral*, at p. 771, quoting *Rowland*, at p. 112.)

This analysis is conducted "at a relatively broad level of factual generality." (*Cabral, supra*, 51 Cal.4th at p. 772.) We analyze the *Rowland* factors to determine "not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." (*Ibid.*; see *Kesner*, *supra*, 1 Cal.5th at pp. 1143–1144.) "In other words, the duty analysis is categorical, not case specific." (*Regents*, *supra*, 4 Cal.5th at p. 629.)

"The *Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability. The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Regents*, *supra*, 4 Cal.5th at p. 629; see *Kesner*, *supra*, 1 Cal.5th at p. 1145.) It bears noting that different timeframes are relevant to different aspects of the analysis. Whereas foreseeability issues are assessed based on information available during the time of the alleged negligence (see *Kesner*, at pp. 1145–1146), "our duty analysis is forward-looking" in regard to policy issues surrounding burdens that would be placed on defendants (*id.* at p. 1152). We conclude that, although the transmission of

COVID-19 to household members is a foreseeable consequence of an employer's failure to take adequate precautions against the virus in the workplace, policy considerations ultimately require an exception to the general duty of care in this context.

a. *Foreseeability Factors*

"The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care articulated by [Civil Code] section 1714 is whether the injury in question was foreseeable." (*Kesner*, *supra*, 1 Cal.5th at p. 1145.) In making this assessment, the court must focus not on particularities of the defendant's conduct and the plaintiff's injury, but on "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . ." (*Cabral*, *supra*, 51 Cal.4th at p. 772.)

The first question here, then, is whether it was foreseeable that an employer's negligent failure to adhere to promulgated workplace precautions against the spread of COVID-19 could result in transmission of the virus to employees' households. Victory does not dispute that the foreseeability factor weighs in favor of recognizing a duty of care. The highly contagious and potentially deadly nature of COVID-19 had been widely publicized by the late spring of 2020. In addition to general public knowledge, employers allowed to continue operations during this time were subject to strict regulations designed to limit transmission of the virus. As relevant here, the City and County of San Francisco's April 29, 2020 health order mandated specific health and safety precautions to prevent the spread of COVID-19 at construction jobsites. Among other things, employers like Victory were required to: screen workers for

symptoms daily upon arrival at the jobsite; maintain social distancing between workers except as strictly necessary for the work; remove any infected worker from the jobsite immediately and sanitize their work area; stagger trades to reduce worker density; provide workers with personal protective equipment appropriate for use in construction; and provide ventilation in the work area to the extent possible.[9]

In *Kesner*, we found industry guidance relevant in concluding it was reasonably foreseeable that asbestos fibers carried home on workers' clothing could cause injury to household members. (*Kesner, supra*, 1 Cal.5th at pp. 1145–1146.) Standards published by the Occupational Safety and Health Administration and other industrial hygiene regulations required that employers minimize employees' exposure to airborne asbestos. We concluded these sources put employers on notice of the risks of take-home exposure. (See *id*. at pp. 1146–1148.) Similarly here, government health orders notified employers of the reasonable foreseeability that COVID-19 could be transmitted not only within the workplace but also to individuals who came into contact with infected employees. The analogy is not perfect. Companies that used asbestos likely had access to a deeper well of scientific knowledge about the dangers of asbestos and methods for preventing its transfer

---

[9]     Plaintiffs contend the county's health order provides the appropriate *standard* of care, yet some amici curiae have raised arguments concerning whether the health order created a freestanding *duty*. Whether a local measure enacted on an emergency basis could appropriately impose a tort duty extending to employees' household members is an issue not encompassed in the certified questions. Accordingly, we express no opinion on it.

offsite than was available in the early months of the pandemic. Nevertheless, we conclude sufficient information was provided to employers like Victory that it was reasonably foreseeable their failure to take adequate precautions against spread of the virus could result in its transmission to employees' households.

The second foreseeability factor in a *Rowland* analysis, "the degree of certainty that the plaintiff suffered injury" (*Rowland*, *supra*, 69 Cal.2d at p. 113), is relevant "primarily, if not exclusively, when the only claimed injury is an intangible harm, such as emotional distress" (*Bily*, *supra*, 3 Cal.4th at p. 421). In contrast, the personal injury claims we address here are both tangible and amenable to compensation. (See *Regents*, *supra*, 4 Cal.5th at p. 630; *Kesner*, *supra*, 1 Cal.5th at p. 1148.)

The third *Rowland* factor, closeness of the connection between conduct and injury (*Rowland*, *supra*, 69 Cal.2d at p. 113), "is strongly related to the question of foreseeability itself" (*Cabral*, *supra*, 51 Cal.4th at p. 779). Generally, when the injury is connected to the defendant's negligent act only distantly or indirectly, the risk of that type of injury from the category of negligent conduct at issue is "likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable." (*Ibid.*) This factor is distinct, however, because it "accounts for third party or other intervening conduct." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1086.) "Where the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not ' "diminish the closeness of the connection between defendant['s] conduct and plaintiff's injury." ' " (*Ibid.*; see *Kesner*, *supra*, 1 Cal.5th at p. 1148.)

Similar to *Kesner*, the relevant intervening conduct alleged here is that an employee, having been exposed to the virus at work, would contract COVID-19 and spread it to people in his household. (See *Kesner, supra,* 1 Cal.5th at p. 1148.) Given the high transmissibility of the virus, it was reasonably foreseeable that an employee negligently exposed at work would transmit the virus to household members. "An employee's return home at the end of the workday" is a predictable and expected occurrence. (*Id.* at p. 1149.) When, in doing so, the employee serves as a vector in spreading a highly contagious disease to household members, the transmission can be attributed to the employer's negligence in failing to take reasonable precautions to prevent workplace exposure. (See *id.* at pp. 1148–1149.)

Victory protests that the highly contagious nature of COVID-19 instead weighs *against* finding a close connection between the misconduct and the injury. It notes that employees may encounter numerous potential sources of exposure to the virus every day. As a result, it argues, the origin of an employee's infection is ultimately impossible to trace. Because the virus is highly contagious, an employee could have contracted COVID-19 from an exposure while commuting to work, stopping at the grocery store on the way home, or even at work but without fault of the employer. Moreover, as amicus curiae CEA points out, tracing the source of an infection would be even more difficult at a construction jobsite than at most workplaces because construction sites typically involve multiple contractors and subcontractors working side by side, along with other professionals. The situation here is thus distinguishable from that in *Kesner*, where the only plausible source of asbestos fibers brought home was the employee's workplace. The nature

of the intervening conduct is also more complicated here than in *Kesner*, where the conduct consisted only of the employee's return home at the end of the workday. Here, many factors could affect the likelihood that an employee would contract and transmit COVID-19. Employees may exercise varying levels of diligence in properly wearing a mask, avoiding crowds, or employing other precautions to prevent illness. The line between an employer's negligence and transmission of the virus to household members is thus not as direct as in the asbestos context.

Plaintiffs dismiss these arguments as attacks on causation, stressing that the allegations of their complaint must be accepted as true at this stage of the litigation. Yet the examination of causal connections, which is what this factor requires, *is* an inquiry akin to analyzing proximate causation. Victory is correct in observing that the connection between wrongful conduct and injury is somewhat attenuated here, and we conclude that, overall, this factor weighs only slightly in favor of recognizing a duty of care. "In determining whether one has a duty to prevent injury that is the result of third party conduct, the touchstone of the analysis is the foreseeability of that intervening conduct." (*Kesner*, *supra*, 1 Cal.5th at p. 1148.) Regardless of alternative sources of exposure, or variations in the personal precautions employees undertake, it is plainly foreseeable that an employee who is exposed to the virus through his employer's negligence will pass the virus to a household member.

b.   *Policy Factors*

Although *Rowland*'s foreseeability factors generally weigh in favor of recognizing a duty here, "foreseeability alone is not

sufficient to create an independent tort duty." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.) "A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 502.) Accordingly, we examine *Rowland*'s policy factors to determine whether they support an exception to Civil Code section 1714's duty of care for this class of negligent conduct. (See *Cabral*, *supra*, 51 Cal.4th at pp. 772–773.) In doing so, we are mindful that social conditions surrounding COVID-19, much like the virus itself, have evolved a great deal since the start of the pandemic, and these changes are likely to continue. We acknowledge that the calculus might well be different in the future.

The first policy factor concerns "the moral blame attached to the defendant's conduct." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) "We have said that if there were reasonable ameliorative steps the defendant could have taken, there can be moral blame 'attached to the defendants' failure to take steps to avert the foreseeable harm.' " (*Vasilenko*, *supra*, 3 Cal.5th at p. 1091.) The failure to take reasonable precautions to prevent harm is, of course, the essence of any negligence claim, and this one is no exception. Plaintiffs argue Victory's failure to follow all precautions outlined in the county health order carries significant moral blame because this conduct increased the risk of COVID-19 infections. But Victory and its supporting amici curiae observe that moral blame is typically found when the defendant reaps a financial benefit from the risks it has created. For example, in *Kesner*, we observed that commercial entities

"benefitted financially from their use of asbestos and had greater information and control over the hazard than employees' households." (*Kesner*, *supra*, 1 Cal.5th at p. 1151; see *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 586.) While Victory and other companies certainly did not profit from the spread of COVID-19, it is less clear whether such companies may have benefitted from ignoring health and safety protocols. During the early months of the pandemic, essential businesses like Victory were permitted to operate, presumably at a profit, but only if they strictly adhered to precautions in government health orders. Some of these precautions, such as quarantining workers potentially exposed to the virus, acquiring and distributing protective gear, and rearranging work schedules, may have posed significant implementation costs. Disregarding those standards would potentially result in related cost savings.

Relative inequality between the parties may also bear upon moral blame. "We have previously assigned moral blame, and we have relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue." (*Kesner*, *supra*, 1 Cal.5th at p. 1151.) Even if few initially knew much about COVID-19 or its transmissibility, companies are likely to have, or have access to, superior knowledge about infection outbreaks in their workforce, an important consideration given the highly contagious nature of the virus. They also have a superior ability to control the overall workplace environment to prevent infections, although individual employees also bear some responsibility in this regard. On balance, considering their greater access to knowledge and

control, we conclude the moral blame factor weighs in favor of establishing a duty. (See *Regents*, *supra*, 4 Cal.5th at pp. 631–632.)

The next *Rowland* factor, the "policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible." (*Cabral*, *supra*, 51 Cal.4th at p. 781.) Placing the cost of negligence on responsible parties is generally thought to induce behavioral changes that will make the activity in question safer. (See *Kesner*, *supra*, 1 Cal.5th at p. 1150.) However, "[t]he policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability." (*Cabral*, at pp. 781–782.) This factor thus examines both the positive and the negative societal consequences of recognizing a tort duty. (See *Vasilenko*, *supra*, 3 Cal.5th at pp. 1089–1090 [discussing harmful consequences that could result from a finding of duty].)

Public policy strongly favors compliance with health orders to prevent the spread of COVID-19. Recognizing a duty of care beyond the workplace could enhance employer vigilance in this regard. However, there is only so much an employer can do. Employers cannot fully control the risk of infection because many precautions, such as mask wearing and social distancing, depend upon the compliance of individual employees. Employers have little to no control over the safety precautions taken by employees or their household members outside the workplace. Nor can they control whether a given employee will be aware of, or report, disease exposure. There is also a possibility that imposing a tort duty not covered by workers' compensation could lead some employers to close down, or to

impose stringent workplace restrictions that significantly slow the pace of work. The economic impact of such changes could be substantial and is difficult to forecast. For businesses regarded as essential and projects that serve the social welfare, slowed operations or shutdowns could be particularly detrimental. On balance, this factor is mixed or weighs slightly against imposing a duty to nonemployees.

The next *Rowland* factor, and the one emphasized by Victory and its supporting amici curiae, examines "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) Victory's core concern here is that recognizing a tort duty to employees' household members[10] would impose enormous and unprecedented financial burdens on employers, both in

_____

[10] Victory's burden argument initially appears to rest on a broader framing. It asserts: "There is simply no limit to how wide the net will be cast: the wife who claims her husband caught COVID-19 from the supermarket checker, the husband who claims his wife caught it while visiting an elder care home, the member of a sorority who claims a sister . . . serving on jury duty caught it from the court bailiff . . . ." While we agree that a duty to prevent secondary COVID-19 infections could potentially encompass all these scenarios, plaintiffs have proposed limiting the duty to household members of employees. Consistent with that limitation, the certified question we have been asked to answer is whether, under California law, "an employer owe[s] a duty to the households of its employees to exercise ordinary care to prevent the spread of COVID-19." (*Kuciemba v. Victory Woodworks, Inc.* (9th Cir. 2022) 31 F.4th 1268, 1270 [order certifying questions to the Supreme Court of California].) Accordingly, we express no view on the propriety of recognizing a duty beyond this limited context, nor any burdens that would result from doing so.

potential damages awards and litigation costs.  We encountered similar arguments in *Kesner*.  Plaintiffs rely heavily on *Kesner*'s analysis, but there are some significant differences that counsel for a different result here.

As discussed, *Kesner* considered whether commercial users of asbestos owe a duty of care, as employers or landowners, to prevent secondary asbestos exposure by individuals offsite. (*Kesner*, *supra*, 1 Cal.5th at p. 1140.)  The plaintiffs' decedents had developed mesothelioma, a deadly cancer, through contact with asbestos fibers carried home from work on a family member's clothing.  (*Id*. at p. 1141.)  In the *Rowland* analysis to determine whether a duty was owed to such persons, the defendants maintained that "[a]llowing tort liability for take-home asbestos exposure would dramatically increase the volume of asbestos litigation, undermine its integrity, and create enormous costs for the courts and community."  (*Id*. at p. 1152.) They also argued the cases would be difficult to prove due to the passage of time, given the long latency period between exposure and development of the disease.  (*Ibid*.)  We responded to these arguments "by observing that the relevant burden in the analysis of duty is not the cost to the defendants of compensating individuals for past negligence.  To the extent defendants argue that the costs of paying compensation for injuries that a jury finds they have actually caused would be so great that we should find no duty to prevent those injuries, the answer is that shielding tortfeasors from the full magnitude of their liability for past wrongs is not a proper consideration in determining the existence of a duty.  Rather, our duty analysis is forward-looking, and the most relevant burden is the cost to the defendants of upholding, not violating, the duty of ordinary care."  (*Ibid*.)

While employers may already be required to implement health and safety protocols to protect their employees from COVID-19 infections, concluding they owe a duty to the household members of employees has the potential to alter employers' behavior in ways that are harmful to society. Because it is impossible to eliminate the risk of infection, even with perfect implementation of best practices, the prospect of liability for infections outside the workplace could encourage employers to adopt precautions that unduly slow the delivery of essential services to the public. Even San Francisco's health order, imposed early in the pandemic, acknowledged that compliance cannot always be total and may give way "to the limited extent necessary . . . to carry out the work of Essential Businesses." Moreover, if a precedent for duty is set in regard to COVID-19, the anticipated costs of prevention, and liability, might cause some essential service providers to shut down if a new pandemic hits. This negative "consequence[] to the community" (*Rowland, supra,* 69 Cal.2d at p. 113), while hypothetical, cannot be ignored. A finding of duty may be inappropriate if its recognition would deter socially beneficial behavior. (See *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 402.)

Although *Kesner* cautioned that "the most relevant burden" in a *Rowland* analysis is the cost of upholding a tort duty (*Kesner, supra,* 1 Cal.5th at p. 1152), we did not completely ignore the financial consequences that could result from increased litigation. Indeed, *Rowland*'s formulation of this factor incorporates such considerations, because it requires analysis of the burden of "imposing a duty to exercise care *with resulting liability* for breach." (*Rowland, supra,* 69 Cal.2d at p. 113, italics added.) We observed in *Kesner* that the

defendants had raised a "forceful contention" in pointing out that a finding of duty "would open the door to an 'enormous pool of potential plaintiffs.' " (*Kesner*, at p. 1153.) Conceding that there were legitimate concerns about the potential breadth and unmanageability of claims, we nevertheless concluded these problems did not require a categorical rule against tort liability for take-home asbestos exposure. Instead, these concerns were addressed by limiting the scope of the duty. (*Id.* at p. 1154.) We determined it was sensible, in that context, to limit the duty to prevent take-home asbestos exposure to household members only. (*Id.* at pp. 1154–1156.)

Plaintiffs here contend the burdens resulting from liability for secondary COVID-19 infections can be adequately addressed by imposing a similar limit. For this reason, they ask us to recognize a duty of care extending only to individuals who share a household with the employee. *Kesner*'s approach cannot be translated so seamlessly into the present context, however. For one thing, the "household members" limit made sense in *Kesner* because the mechanism of injury there required frequent and sustained contact with asbestos fibers on workers' clothing and effects. (See *Kesner*, *supra*, 1 Cal.5th at pp. 1154–1155.) Yet transmission of the SARS-CoV-2 virus can occur in as little as 15 minutes of contact with an infected person or even after the infected person has left the space. (See Centers for Disease Control and Prevention, Scientific Brief: SARS-CoV-2 Transmission <https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html> [as of July 6, 2023]. All internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.) Drawing a limit at household members would be more arbitrary in the COVID-19

context because it would exclude a higher percentage of injured people.

The broader reach of the proposed duty is another difference, and the most important one, between this case and *Kesner*. The duty we considered in *Kesner* involved a relatively small pool of defendants: companies that used asbestos in the workplace. There was also a much smaller pool of potential plaintiffs: household members who were exposed to asbestos from an employee's clothing and then went on to develop mesothelioma. Here, by contrast, a duty to prevent secondary COVID-19 infections would extend to *all* workplaces, making every employer in California a potential defendant. And unlike mesothelioma, which is known to be "a very rare cancer, even among persons exposed to asbestos" (*Hamilton v. Asbestos Corp* (2000) 22 Cal.4th 1127, 1135−1136), the virus that causes COVID-19 is extremely contagious, making infection possible after even a relatively brief exposure. Even limiting a duty of care to employees' household members, the pool of potential plaintiffs would be enormous, numbering not thousands but millions of Californians. "Ultimately, the limited transmissibility of asbestos provides a natural curb on the pool of potential plaintiffs. With COVID-19, by contrast, the pool of potential plaintiffs isn't a pool at all — it's an ocean." (*Ruiz v. ConAgra Foods Packaged Foods LLC* (E.D.Wis. 2022) 606 F.Supp.3d 881, 888 (*Ruiz II*).) In the past, "[e]ven when foreseeability was present, we have . . . declined to allow recovery on a negligence theory when damage awards threatened to impose liability out of proportion to fault . . . ."

(*Bily*, *supra*, 3 Cal.4th at p. 398.)  That prospect is certainly presented by the duty rule proposed here.[11]

In addition to dire financial consequences for employers, and a possibly broader social impact, the potential litigation explosion facilitated by a duty to prevent COVID-19 infections in household members would place significant burdens on the judicial system and, ultimately, the community.  As amicus curiae CEA aptly put it, "If there was ever a 'floodgates' situation, this is it."  Courts would have to manage a very large number of suits, and variations in individual exposure history and precautions against the virus would likely make it difficult, if not impossible, for the cases to be grouped into collective or class actions.  Fact-specific disputes could also make these cases complex and time-consuming to litigate.  For example, a motion challenging proximate causation based on alternative sources of exposure could not be brought, or resolved, until after the case had proceeded through discovery.  Expert testimony on causation might be required, making resolution on summary judgment difficult or impossible.  Similarly, whether an employer breached a duty of care would likely present highly

---

[11]    Plaintiffs counter that last year the Legislature failed to pass an industry-supported bill that would have shielded businesses from liability for direct or indirect transmission of COVID-19.  (Assem. Bill No. 1313 (2001–2002 Reg. Sess.) § 2.) We decline their invitation to draw significance from this fact. "Legislative silence is an unreliable indicator of legislative intent in the absence of other indicia.  We can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.  'As evidences of legislative intent they [unpassed bills] have little value.' " (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1349, fn. omitted.)

fact-specific issues that could not be resolved without extensive discovery or witness testimony. The burden on the courts posed by a flood of complex cases that cannot be resolved in the early stages of litigation would be daunting.

Given these considerations, we conclude "the burden to the defendant and consequences to the community" weigh against imposing a duty of care and thereby authorizing liability for its breach. (*Rowland*, *supra*, 69 Cal.2d at p. 113)

The final *Rowland* factor considers the availability and cost of insurance. (*Rowland*, *supra*, 69 Cal.2d at p. 113.) Although the parties do not discuss this factor directly, some amici curiae represent that commercial insurers have been reluctant to provide coverage for losses related to COVID-19. Published decisions in this area concern first party claims for property damage and lost income due to COVID-19 (see, e.g., *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96) and may not give a reliable indication of whether third party liability claims would be covered. Given the dearth of information available at this time, we are unable to draw any firm conclusions as to whether this factor supports imposing a duty.

In sum, while the foreseeability factors and the policy factor of moral blame largely tilt in favor of finding a duty of care, the policy factors of preventing future harm and the anticipated burdens on defendants and the community weigh against imposing such a duty. "In assessing duty, however, we do not merely count up the factors on either side." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1092.) Some factors may be so weighty as to tip the balance one way or the other. Here, the significant and unpredictable burden that recognizing a duty of care would

impose on California businesses, the court system, and the community at large counsels in favor of an exception to the general rule of Civil Code section 1714.  Imposing on employers a tort duty to each employee's household members to prevent the spread of this highly transmissible virus would throw open the courthouse doors to a deluge of lawsuits that would be both hard to prove and difficult to cull early in the proceedings.  Although it is foreseeable that employees infected at work will carry the virus home and infect their loved ones, the dramatic expansion of liability plaintiffs' suit envisions has the potential to destroy businesses and curtail, if not outright end, the provision of essential public services.  These are the type of "policy considerations [that] dictate a cause of action should not be sanctioned no matter how foreseeable the risk."  (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274.)  In some cases, "the consequences of a negligent act must be limited in order to avoid an intolerable burden on society."  (*Ibid*.)  This is such a case.

### 3.    *Out-of-State Cases*

The parties have alerted us to three decisions from other states considering the issue now before us.  All have declined to recognize a duty for employers to prevent the spread of COVID-19 outside the workplace.

In *Madden*, *supra*, 2021 WL 2580119, a flight attendant contracted COVID-19 after she was required to attend in-person training.  She passed it to her husband, who died a month later of complications from the virus.  (*Id*. at p. *1.)  The federal district court, applying Maryland law, analyzed whether the airlines owed a duty of care to the employee's spouse using the same seven-factor test California courts apply under *Rowland*.  (*Id*. at p. *4; see *Kiriakos v. Phillips* (Md. 2016) 139 A.3d 1006,

1033.) Although foreseeability and most other factors weighed in favor of duty, the court found the societal consequences "harder to justify" because imposing a duty "would significantly expand the field of potential liability." (*Madden*, at p. *6.) In particular, "finding a duty . . . would leave employers litigating countless COVID-19 third-party exposures simply by virtue of contact with their employees during the pandemic. All that would functionally be required for duty to attach would be potential exposure at work and subsequent contact with a foreseeable third party, which represents a relatively common set of circumstances." (*Ibid.*) After weighing all the factors, the court concluded concerns in Maryland case law over "limiting the class of prospective future plaintiffs" were dispositive and precluded a finding of duty. (*Id.* at p. *8.)

Similar concerns led to the same result in another case alleging a spouse's wrongful death from COVID-19, *Ruiz II*, *supra*, 606 F.Supp.3d 881. The federal district court applied a six-factor test under Wisconsin law to determine whether public policy considerations precluded an employer's liability for transmission of COVID-19 to third parties. (*Id.* at p. 1, citing *Alvarado v. Sersch* (2003) 262 Wis.2d 74, 84 [662 N.W.2d 350, 354].) Consistent with *Madden*, which it discussed at length, the court held that Wisconsin public policy did not support recognizing a duty of care. (*Ruiz II*, at pp. 882, 890.) Considering the ubiquity and high transmissibility of the virus, the court concluded, "allowing recovery . . . would create too unreasonable a burden on the defendant, and . . . would enter a field that has no sensible stopping point." (*Id.* at p. 883.)

An Illinois trial court reached the same conclusion in *Iniguez*, *supra*, 2021 WL 7185157, another third party wrongful death case. In ruling on the employer's motion to dismiss, the

court applied a four-factor test balancing foreseeability and likelihood of injury against the burden of preventing injury and the consequences of placing this burden on the defendant. (*Id*. at p. *2.) It concluded public policy did not support finding a duty of care, observing "both the magnitude of guarding against the burden of employees spreading Covid to third parties and, perhaps more importantly, the consequences of placing that burden on Defendant mitigate against the imposition of a duty herein." (*Id*. at p. *4.)

As noted, these cases are not binding on us, and they can be distinguished based on particular aspects of the different states' laws. For example, Maryland law is especially focused on limiting duty in the third party context. (See *Madden*, *supra*, 2021 WL 2580119, at p. *8.) And, a day after the *Ruiz II* plaintiffs filed suit, Wisconsin legislators passed a law shielding businesses from civil liability related to COVID-19, a development that made the state's policy position on duty quite clear. (See *Ruiz II*, *supra*, 606 F.Supp.3d at p. 889; Wis. Stat. § 895.476.) We have not relied on these out-of-state cases as authority for our analysis. We discuss them merely to note that their holdings are consistent with our conclusion that California's policy considerations, as articulated in *Rowland*, do not support recognizing a duty of care to prevent third party COVID-19 infections.

## III. CONCLUSION

In conclusion, we answer the Ninth Circuit's questions as follows:

(1) If an employee contracts COVID-19 at the workplace and brings the virus home to a spouse, the derivative injury rule

of California's workers' compensation law does not bar a spouse's negligence claim against the employer.

(2) An employer does not owe a duty of care under California law to prevent the spread of COVID-19 to employees' household members.

**CORRIGAN, J.**


**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Kuciemba v. Victory Woodworks, Inc.

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S274191
**Date Filed:**  July 6, 2023

---

**Court:**
**County:**
**Judge:**

---

**Counsel:**

Venardi Zurada, Mark L. Venardi, Martin Zurada and Mark Freeman for Plaintiffs and Appellants.

Alan Charles Dell'Ario for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Hinshaw & Culbertson and William Bogdan for Defendant and Respondent.

O'Connor Thompson McDonough Klotsche and John W. Klotsche for Construction Employers' Association as Amicus Curiae on behalf of Defendant and Respondent.

Eimer Stahl and Robert E. Dunn for the Chamber of Commerce of the United States of America, National Federation of Independent Business, National Association of Manufacturers, the California Workers' Compensation Institute, the California Chamber of

Commerce, the Restaurant Law Center and the National Retail Federation as Amici Curiae on behalf of Defendant and Respondent.

Munger, Tolles & Olson, Malcolm A. Heinicke, Benjamin J. Horwich, Joseph Lee and Donald B. Verrilli for See's Candies, Inc., and See's Candy Shops, Inc., as Amici Curiae on behalf of Defendant and Respondent.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Martin Zurada
Venardi Zurada LLP
101 Ygnacio Valley Road, Suite 100
Walnut Creek, CA 94596
(925) 937-3900

Allan Charles Dell'Ario
Attorney at Law
P.O. Box 359
Napa, CA 94559
(707) 666-5351

William Bogdan
Hinshaw & Culbertson LLP
50 California Street, Suite 2900
San Francisco, CA 94111
(415) 263-8127

Robert E. Dunn
Eimer Stahl LLP
99 South Almaden Boulevard, Suite 642
San Jose, CA 95113
(408) 889-1690

Benjamin J. Horwich
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4066